Adam Troy **GRIFFIN**, Appellant,

v.

The **STATE** of Texas.

No. PD–1036–05.

Court of Criminal Appeals of Texas.

Dec. 20, 2006.

Opinion Denying Rehearing
Feb. 14, 2007.

Stan Schwieger, Waco, for Appellant.

Kathryn J. "Jody" Gilliam Marlin, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

This is a "stop and frisk," [1] "plain-feel" [2] case. The police stopped and detained

---

**1.** *See Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding

"that where a police officer observes unusual conduct that leads him reasonably to con-

appellant in a public area to investigate whether he was selling crack cocaine. We decide that the police legally seized crack cocaine from inside appellant's pocket during a pat-down search of the pocket.

The evidence in this case shows that appellant was arrested for possessing a small amount of residue cocaine in a "long plastic tube" about two days before the incident in question (the legality of this arrest is not at issue in this case). One or two days later, a confidential informant, whom the police considered reliable, provided the police (narcotics investigator Kingsley) with information that appellant was selling crack cocaine at a specific location in a "drug trafficking" part of town. About five minutes later, three law enforcement officers (Kingsley, Eskelin and Hamilton) went to that location and saw appellant. They did not observe appellant engaged in any overt criminal activity, but they knew that appellant carried narcotics in tubes and that appellant had been arrested a day or two before for possessing

cocaine in a "long plastic tube."[3] For example, Eskelin testified:

Q. [PROSECUTION]: And [appellant], did you have information that he'd also been arrested a couple of days prior to this?

A. [ESKELIN]: One day prior, yes.

Q. And do you know at that time what he was found to be in possession of?

A. I believe it was a small amount of residue cocaine.

Q. Okay. And what about containers?

A. A long plastic tube.

Q. Okay. Did you receive other information that he carried narcotics in tubes?

A. Yes.

Appellant acted nervous when he saw the police approaching him. The police did not believe that probable cause existed for appellant's arrest at this time; but, they did stop and detain appellant to investigate the information provided by the informant.[4] Eskelin immediately frisked the

clude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him" and that such "a search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken").

2. *See Minnesota v. Dickerson*, 508 U.S. 366, 374–75, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (*police may seize non-weapons contraband detected during a protective "pat-down" search for weapons under* Terry *when the contraband's "contour or mass makes its identity immediately apparent"*).

3. The police knew that appellant had been arrested for possessing cocaine in a long plastic tube. The testimony differed on whether the informant specifically told the police that the crack cocaine appellant was selling in this case was in "two plastic vials." Kingsley testified at the suppression hearing that the informant told him that the crack cocaine appellant was selling was in "two plastic vials." Eskelin testified that he did not believe that the informant mentioned that this crack cocaine was in "two plastic vials."

4. Kingsley testified about the articulable circumstances that made him suspect that appellant was selling crack cocaine when the police stopped and detained appellant for investigatory purposes.

Q. [PROSECUTION]: As far as [appellant] doing anything suspicious, is your knowledge of him being arrested and his criminal background, coupled with being in a high-crime narcotics dealing area and with the information from a confidential informant—does that make you suspicious?

outside of appellant's left front pocket for "officer safety" and felt two long cylindrical tubes which Eskelin believed contained illegal narcotics based on his knowledge that appellant carried illegal narcotics in tubes. When Eskelin felt these tubes in appellant's pocket, he instructed Hamilton to handcuff appellant. As Hamilton handcuffed appellant, Eskelin removed the tubes from appellant's pocket and confirmed that they contained numerous rocks of crack cocaine. Eskelin testified:

Q. [PROSECUTION]: All right. Continue.

A. [ESKELIN]: As we walked up to him, I asked [appellant] to stand up and place his hands on the wall of the building. He then asked me why. At that time, I took him by his arm and told him that he was observed engaging in activity believed to be the sales of illegal narcotics, and I assisted him to his feet.

Q. Okay. He was sitting down?

A. Yes, he was.

Q. Okay. Go ahead.

A. He was very tense—his muscles were very tense, although he did comply with my request. We walked approximately two to three feet to the side of the bench where it was—the wall was open, and he did place his hands up on the wall as I requested.

Q. Okay.

A. At that time, I began to pat him down. I started with his left front pocket. As I started to feel his left front pocket, [appellant] took his left hand off the wall and tried to turn around. At that time, I took his left hand and placed it back up on the wall. [Hamilton] took hold of his right arm and brought it back around behind his back.

A. [KINGSLEY]: Yes, ma'am.

I continued to—the pat-down, and at that time, I felt two long, cylindrical objects in his left front pocket.

Q. When you felt these, what did you believe it to be?

A. Containers containing illegal narcotics, crack cocaine.

Q. What you felt, did that match and was it consistent with what you had heard had been found on [appellant] a couple of days prior to that that contained cocaine?

A. Yes.

Q. Okay. After that, what happened?

A. At that time, when I felt the two cylindrical objects in his pocket, I told [Hamilton] to go ahead and place handcuffs on him. As [Hamilton] was placing the handcuffs on him, I retrieved the objects from his pocket, and there were in fact two long, cylindrical plastic tubes containing numerous rocks of rock-like objects believed to be crack cocaine.

Eskelin testified that it is common practice for him to frisk a suspect he is investigating for drug-dealing because of the possibility that the suspect might be armed.

Q. [PROSECUTION]: When you're investigating narcotics and drug activity, is it your common practice to pat down a suspect that you think is dealing or holding narcotics?

A. [ESKELIN]: Yes, it is.

Q. And why is that?

A. Because—especially in the area down there where drug dealers are known, in my experience—for the possibility that they may be carrying weapons, may be a danger to myself and others.

However, Eskelin also stated on cross-examination:

Q. [DEFENSE]: You weren't patting him down to see if he had anything in his pockets that might be narcotics, correct?

A. [ESKELIN]: I was patting him down for officer safety.

Q. How long have you known [appellant]—or known of him?

A. A couple years.

Q. Have you ever known him to carry a weapon?

A. No, sir.

Q. Did you have any reason to believe—did you receive any information whatsoever that [appellant] was armed—

A. No, sir.

Q. —or that he might be dangerous?

A. No, sir.

Q. Either in this case or any time in the past?

A. No, sir.

Q. So when you say, "for officer safety," is that a routine thing that you do to everybody?

A. Not everybody.

Q. Okay. But in saying it's for officer safety, you had no reason to believe and no information present or past that he might be dangerous or carrying a weapon, correct?

A. That is correct.

Q. The items which you felt, you clearly knew they were not a weapon, correct?

A. That is correct.

Q. As a matter of fact, at that time, when you pulled them out—before you pulled them out of his pocket, you knew that they were not a weapon?

A. That is correct.

Q. You knew they were of no danger to you, correct?

A. Yes, sir.

Q. Okay. At that point, could you—all you could tell is it was a round, cylindrical tube, correct?

A. Yes, sir.

Q. Or two of them, right?

A. Correct.

Q. You could not feel or tell that it was—as to what was contained inside the tubes, could you?

A. That is correct.

Q. Okay. And before you pulled them out of his pocket, you instructed the other officer to place him under arrest, correct?

A. I instructed the other officer to handcuff him, yes.

Q. Okay. He was at that time absolutely in custody, correct?

A. Correct.

Q. He was not free to leave?

A. Correct.

Q. And at that point, then you pulled these tubes out and opened them and inspected them, correct?

A. Correct.

Q. And once again, you knew before you did all this that these were not weapons?

A. Correct.

Q. And just one more thing: At the time you laid hands on him, he was not under arrest for any particular offense?

A. That is correct.

Appellant's boilerplate motion to suppress generally alleged that the State's evidence was obtained in violation of appellant's federal and state constitutional rights and unspecified state statutory rights. Appellant claimed at the suppression hearing that the police lacked reasonable suspicion "justifying an investigatory detention" because the only information known to the police was that appellant was

at the location where the informant said he would be.

> [DEFENSE]: That's what we have. And there's some more cases there, too. What we have here, Judge, is they didn't go to arrest him; they went to do an investigation. All that they verified was [appellant] is at this corner. Any person driving by who knew [appellant] could make that determination. That is not, in and of itself, illegal.
>
> When you look at the totality of the circumstances, even if this is a reliable informant, they did nothing and confirmed nothing else. There was no future [sic] movements; there was no actions; there was nothing else that they confirmed. They just immediately went and started patting him down and stopped him and detained him, of which they had no right even to—they had no right to even detain him.

Appellant also seemed to claim that his initial warrantless investigatory detention (not his subsequent warrantless arrest) violated state statutory law because the State did not prove that appellant "was about to escape and there was no time to procure a warrant." [5]

> [DEFENSE]: In that case, the State—the Court found that the State failed to prove any exception. Even though the officer had obtained information from a credible person that the Defendant had committed a felony, the State did not prove that the Defendant was about to escape and there was no time to procure a warrant.
>
> In this situation, I in fact proved the opposite. As the officers are approaching, everybody is just standing there. Nobody tried to run away. Clearly, no evidence of attempted—that they're about to escape; no reason why they could not · have obtained a warrant. There's no evidence of that.

The trial court denied appellant's motion to suppress. The Court of Appeals decided on direct appeal that the initial investigatory detention of appellant was based on reasonable suspicion; that the police were justified in frisking appellant for weapons; that the warrantless seizure of the crack cocaine from appellant's pocket during this weapons frisk was valid under the "plain-feel" exception to the Fourth Amendment's warrant requirement; and that appellant's subsequent warrantless arrest did not violate any state or federal constitutional provisions or any provision of state statutory law. *See Griffin v. State*, No. 10–04–00069–CR slip op. at 7–11, 2005 WL 851092 (Tex.App.-Waco, delivered April 13, 2005) (not designated for publication). We granted review. The ground upon which we granted review states:

> The Tenth Court of Appeals erred and [sic] finding the search and resulting arrest of Appellant were legal.

■ Initially, we decide that the record supports a finding that the police reasonably suspected, based on specific and articulable facts, that appellant was selling crack cocaine in a public place so as to justify the initial stop and detention of him by the police to further investigate his behavior. *See Terry*, 392 U.S. at 21–23, 88 S.Ct. 1868 (police must have specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant police intrusion into Fourth Amendment interests). The police had information from a reliable informant that appellant was selling crack cocaine in a specifically-described drug trafficking

---

5. *Compare* Article 14.04, Tex.Code Crim. Proc., (setting out when police may make a warrant-less **arrest** under state law).

area of town which is exactly where the police found appellant minutes after receiving this information. Police knowledge of appellant's past illegal drug activity (including his arrest for similar activity a day or two before) and his nervousness when they approached him are other specific and articulable circumstances supporting a finding that the police reasonably suspected that appellant was selling crack cocaine. *See Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Cr.App.2000) (police investigative detention of defendant constitutionally justified based on reliable informant's tip and police observation of events which served to corroborate the tip).

■ This, however, is not dispositive of whether Eskelin could legally frisk the outside of appellant's pocket for weapons.[6] This determination is made under an objective standard which is whether the facts available to Eskelin at the time of the frisk "would warrant a reasonably cautious person to believe that the action taken was appropriate." *See O'Hara v. State*, 27 S.W.3d 548, 551 (Tex.Cr.App.2000); *see also Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868. Under this objective standard, Eskelin's testimony that he did not subjectively fear appellant also is not dispositive of whether Eskelin could legally frisk ap-

pellant for weapons. *See O'Hara*, 27 S.W.3d at 551 (under an objective analysis, it does not matter whether officer testified that he was afraid or was not afraid of the defendant).

■ And, we decide that Eskelin was objectively justified in frisking appellant for weapons. We have recognized that it is objectively reasonable for a police officer to believe that persons involved in the drug business are armed and dangerous. *See Carmouche*, 10 S.W.3d at 330 *and cases cited* (objectively reasonable for police to believe that seller of narcotics might be armed because concealed weapons are part and parcel of the drug trade).[7] We decline to hold that this does not apply when a police officer has not known a specific drug-dealer to carry weapons in the past. It still is objectively reasonable for a police officer to believe that this person could still be armed and dangerous at any time he is engaged in the business of selling drugs especially when this drug-dealer had been arrested for the same offense just two days before and moves his hand toward his pocket during an investigative detention based on reasonable suspicion. We decline to hold that it is objectively unreasonable for a reasonably prudent officer to protect him-

---

6. *See Terry*, 392 U.S. at 23, 88 S.Ct. 1868 (crux of case was not validity of officer's investigative detention of defendant, but rather, whether there was justification for officer's invasion of defendant's personal security by searching him for weapons in the course of that investigation); *but see Terry*, 392 U.S. at 32–34, 88 S.Ct. 1868 (Harlan, J., concurring and joining majority opinion) (characterizing majority opinion in *Terry* as holding that when an officer "forcibly" confronts a person suspected of a serious crime, "the officer's right to take suitable measures for his own safely [sic] follow[s] automatically" because there is no reason why such an officer "should have to ask one question and take the risk that the answer might be a bullet").

7. For example, according to a December 2, 2002, Federal Bureau of Investigation press release, approximately 23% of the 69 police officers killed in the line of duty in 2001 in incidents not related to the events of September 11th were investigating "drug-related matters" or "suspicious persons." See http://www.fbi.gov/pressrel/pressrel102/leoka120202.htm. (of the 69 police officers killed in incidents not related to September 11th, eight were slain investigating "drug-related matters" and eight were slain investigating "suspicious persons"); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (relying on similar statistics); *Terry*, 392 U.S. at 24 n. 21, 88 S.Ct. 1868 (same).

self by frisking a possibly violent drug-dealer for weapons even though the officer conducting the frisk in the case at hand testifies that he was not subjectively afraid of the suspect. *See O'Hara*, 27 S.W.3d at 551 (police officer not legally required to testify that he was afraid of the suspect because some policemen will never admit fear).[8]

█ We also decide that Eskelin's removal of the plastic tubes from appellant's pocket during the weapons frisk was valid. The record supports a finding that Eskelin immediately recognized the tubes in appellant's pocket as contraband based on his knowledge that appellant used these types of containers to carry illegal narcotics. *See Dickerson*, 508 U.S. at 375–76, 113 S.Ct. 2130 (if a police officer lawfully frisks a suspect's clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons, and, if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context). The identity of these tubes as contraband evidently was so immediately apparent to Eskelin that he instructed another officer to arrest appellant even before Eskelin removed the tubes from appellant's pocket and confirmed their contents. This is not a case where Eskelin determined that the tubes in appellant's pocket were contraband only after "squeezing, sliding and otherwise manipulating the contents of [appellant's] pocket."

*See Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130 (internal quotes omitted).

█ Finally, the record supports a finding that appellant's arrest in a public place was constitutionally valid because the police had probable cause to arrest appellant once Eskelin discovered the tubes in his pocket. *See Terry*, 392 U.S. at 10, 88 S.Ct. 1868 (if *Terry* stop leads to probable cause that suspect has committed a crime, then police may make a formal "arrest"). And, as a matter of state law, the record supports a finding that the police arrested appellant for an offense committed in their presence. A warrantless arrest is entirely appropriate under these circumstances. *See* Article 14.01, Tex.Code Crim. Proc.

The judgment of the Court of Appeals is affirmed.

PRICE and JOHNSON, JJ., dissented.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

HERVEY, J., delivered the opinion of the Court on rehearing in which KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

Appellant has filed a motion for rehearing claiming that our opinion on original submission "is far too broad to satisfy *Terry*." He claims that this opinion is contrary to Fourth Amendment principles discussed in *Richards v. Wisconsin*[1] by categorically labeling as possibly armed and dangerous all those actively engaged in

---

**8.** We also note that Eskelin requiring appellant to stand up and put his hands on a wall while Eskelin frisked the outside of his pocket for "officer safety" was no more of an intrusion into appellant's personal security than that involved in *Terry*. *See Terry*, 392 U.S. at 7, 88 S.Ct. 1868 (police officer grabbed defendant, spun him around and patted down the

outside of his overcoat during which the officer felt a pistol) and at 26 (frisk of defendant for weapons must be limited to that which is necessary for the discovery of weapons).

**1.** 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

selling drugs in public places for whom no objective and particularized showing of need to frisk (for weapons) is required under *Terry*.[2] Our opinion on original submission should not be read as lessening the requirements of *Terry*. And, the original analysis of whether the limited intrusion into appellant's personal security by Eskelin's pat-down of his outer pocket did not end upon a determination that Eskelin had reasonable suspicion to believe that appellant was dealing drugs in a public place. In considering whether Eskelin's pat-down of appellant's pocket was objectively reasonable, our original opinion also considered that appellant had been arrested for the same offense just two days before[3] and that he moved his hand toward his pocket during the investigative detention. *See Griffin*, at 409. Our opinion on original submission should not be characterized as holding that an objectively reasonable police officer may base a determination that his safety is in danger solely upon the basis that "the suspect is a drug dealer."[4]

**2.** For example, appellant argues in his motion for rehearing that the "correct interpretation of *Terry* is to require that officers base a determination that their safety is in danger upon more than the suspect is a drug dealer."

**3.** Our opinion on original submission also mentioned that Eskelin knew that appellant had been arrested "a day or two before." *See Griffin v. State*, 215 S.W.3d 403, 405, 2006 WL 3733248 (Tex.Cr.App. No. PD–1036–05, delivered December 20, 2006). A reasonable police officer could believe that a suspect facing his second arrest on another felony drug charge in two days might be more likely to engage in violence to avoid this arrest.

**4.** We do note that Justice Harlan filed a separate concurring opinion in *Terry* suggesting that the majority opinion in *Terry* actually supports the proposition that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable

Appellant's motion for rehearing is denied.

PRICE, J., not participating.

suspicion of a crime of violence." *See Terry*, 392 U.S. at 33 (Harlan, J., concurring). Justice Harlan also wrote that "[t]here is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." *See id.* In another case handed down the same day as *Terry*, Justice Harlan filed a concurring opinion stating, "First, although I think that, as in *Terry*, the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed, it is not clear that suspected possession of narcotics falls into this category. If the nature of the suspected offense creates no reasonable apprehension for the officer's safety, I would not permit him to frisk unless other circumstances did so." *See Sibron v. New York*, 392 U.S. 40, 74, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring).