

# NUMBER 13-07-044-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JONATHAN WAYNE GIPSON,                                    Appellant,

v.

THE STATE OF TEXAS,                                           Appellee.

On appeal from the 1-A District Court of Jasper County, Texas.

# O P I N I O N

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Opinion by Justice Yañez**

Appellant, Jonathan Wayne Gipson, was found guilty of committing the offense of aggravated robbery[1] and was sentenced to seven and a half years' imprisonment. In two issues, Gipson asserts the trial court erred in denying his motion to suppress. We affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003).

# I. Background

On September 14, 2005, Jasper Police Department Officers Garret Foster and Gerald Hudson were dispatched to a Wal-Mart where a robbery had taken place. The officers received the dispatch at 3:28 a.m. The dispatcher informed the officers that (1) the suspect was a tall, slender, white male with tattoos; (2) the name of the victim was Mr. Alcorn; and (3) the suspect was last seen running through a wooded area, southwest of the Wal-Mart, directly in front of the store. Officer Foster reached the Wal-Mart parking lot within a minute or two of receiving the dispatch; he entered the parking lot near the wooded area the suspect was last seen running into. Upon entering the parking lot with his patrol vehicle's lights and siren on, Officer Foster observed a blue Toyota preparing to exit the Wal-Mart. As the Toyota was at rest in front of a stop sign within the parking lot, Officer Foster positioned his vehicle in front of the Toyota, obstructing its forward path. According to Officer Foster, the Toyota was the only vehicle he saw preparing to exit the parking lot, and he decided to stop the Toyota because its occupants "were potential suspects or witnesses to a crime."

Officer Foster could see a few white males and one white female in the Toyota. As Officer Foster exited his vehicle and began walking towards the Toyota, the Toyota's driver immediately informed him "that some guy was robbed and that he had helped chase the suspect." Upon learning this, Officer Foster detained the Toyota's occupants for further questioning. Gipson was one of the Toyota's occupants. According to Officer Foster, Gipson was the only tall, slender, white male in the Toyota; Gipson also had tattoos on his arms, appeared nervous, and avoided eye contact with him. The Toyota's passengers, including Gipson, denied having any knowledge of a robbery. Some of the passengers,

2

however, later stated that they were witnesses to the robbery.

While Officer Foster was questioning the Toyota's occupants, Officer Hudson arrived on the scene. Officer Hudson observed Gipson's demeanor as he sat inside the Toyota. According to Officer Hudson, Gipson made a lot of movements in the Toyota, and he appeared "very nervous" and "fidgety." Officer Hudson instructed the Toyota's occupants to exit the vehicle; he then performed a pat-down on all of them. Before performing a pat-down on Gipson, Officer Hudson observed "a big bulk" in Gipson's back pocket. According to Officer Hudson, the objects he felt in Gipson's pocket were the size of credit cards. Officer Hudson removed the objects from Gipson's pocket to ascertain whether Gipson was carrying a weapon; Officer Hudson testified that he has seen knives the size of credit cards. The objects removed from Gipson's pocket turned out to be credit cards belonging to the victim, Mr. Alcorn. At that point, Gipson was placed under arrest.

## II. Standard of Review

Whether a specific search or seizure was reasonable is a mixed question of law and fact, and our review is conducted de novo.[2] We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.[3] We do not engage in our own factual review, rather the trial judge is the sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony.[4] Trial courts are given almost

---

[2] *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).

[3] *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005).

[4] *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

complete deference in determining historical facts.[5] We review the record to determine whether the trial court's ruling is supported by the record and correct under some theory of law applicable to the case.[6]

### III. Legality of the Initial Stop

In his first issue, Gipson contends that the trial court erred because Officer Foster did not possess the requisite reasonable suspicion required to initially detain him and the Toyota's other occupants. At the motion to suppress hearing, Officer Foster stated that he stopped the Toyota because its occupants "were potential suspects or witnesses to a crime." We will begin by assessing the propriety of the latter justification.

In *Terry v. Ohio*, the United States Supreme Court held that a temporary detention is justified when the detaining officer has specific, articulable facts which, taken together with rational inferences from other facts, lead him to conclude the person detained is, has been, or soon will be engaged in criminal activity.[7] When an officer detains a person to determine whether the person being detained was a witness to a crime, the detention becomes distinguishable from those involved in *Terry*.[8] The distinction lies in the fact that a detention made for the purpose of questioning a potential witness is not being made pursuant to an officer's suspicion that the *detainee* was involved or about to be involved in criminal activity; rather, the detention is being made for the purpose of questioning the

---

[5] *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

[6] *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

[7] *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

[8] *See United States v. Ward*, 488 F.2d 162, 168-69 (4th Cir. 1973).

detainee about a *third person*.[9]

In *Illinois v. Lidster*, an individual "challenged the lawfulness of his arrest and conviction on the ground that the government had obtained much of the relevant evidence through use of a checkpoint stop that violated the Fourth Amendment."[10] The checkpoint was created in response to an incident involving a bicyclist that was struck and killed by an unknown motorist that drove away without identifying himself.[11] About one week later at about the same time of night and at about the same place, local police set up the highway checkpoint to obtain more information about the accident from the motoring public.[12]

The United States Supreme Court observed that "[t]he stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others."[13] The Court went on to state that such stops are not "automatically, or even presumptively, constitutional"; rather, their reasonableness and, hence, constitutionality, must be judged on the basis of the individual circumstances.[14] In judging the reasonableness of the stop in question, the Court looked "'to the gravity of the public concerns served by the seizure, the degree to which the seizure advance[d] the public interest, and the severity of the interference with

---

[9] *See id.* at 169.

[10] *Illinois v. Lidster*, 540 U.S. at 419, 422 (2004).

[11] *Id.*

[12] *Id.*

[13] *Id.* at 423 (emphasis in original).

[14] *Id.* at 426.

individual liberty.'"[15]  The Court then held that the stop was reasonable, setting forth the following reasons:  (1) "the stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort"; (2) the "relevant public concern was grave"; (3) the stop "advanced this grave public concern to a significant degree"; (4) the "police appropriately tailored their checkpoint stops to fit important criminal investigatory needs"; and (5) the "stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect."[16]

Applying the reasoning employed in *Lidster*, we find that Officer Foster lawfully detained the Toyota's occupants.  Officer Foster sought to temporarily detain and question the occupants for the purpose of investigating a specific and known crime.  The crime at issue, as was known to Officer Foster at the time of the detainment, was robbery, which is of such grave public concern that the offense constitutes a second-degree felony in this State.[17]  Officer Foster's stop advanced this grave public concern to a significant degree because the stop was being used to obtain information from individuals who were in the vicinity of the crime at the time it occurred, and were thus possible witnesses to the crime.  The stop was also more than appropriately tailored to fit investigatory needs.  Officer Foster not only stopped the Toyota in the parking lot where the robbery occurred, but he stopped it in a specific area of the parking lot where he knew the suspect was last seen fleeing.  Finally, the stop interfered only minimally with the liberty of the Toyota's

---

[15] *Id.* at 426-27 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

[16] *Id.* at 427-28.

[17] *See* TEX. PENAL CODE ANN. § 29.02 (Vernon 2003).  We reference the offense of robbery, rather than aggravated robbery (for which Gipson was convicted), because Officer Foster testified that he did not know that the robbery was aggravated at the time he detained the Toyota's occupants.

6

occupants. Officer Foster had only blocked the front of the Toyota with his patrol car and started walking towards it when its driver announced that he had witnessed the robbery. The duration of the Toyota's detainment thereafter resulted from the need to question an actual witness, rather than a potential witness.

## IV. Legality of the Pat Down

In his second issue, Gipson argues that the pat down was unlawful because Officer Hudson was not warranted in his belief that his safety or the safety of others was in danger. When determining whether an officer's weapons search is justified, an appellate court uses an objective standard to determine whether the facts available to the officer at the time of the search would warrant a reasonably cautious person to believe that such an action is appropriate.[18]

The dispatcher informed Officer Hudson that the suspect was a tall, slender, white male with tattoos; this description led Officer Hudson to focus on Gipson because he was a white male with tattoos, and he was the tallest occupant in the Toyota. Officer Hudson observed Gipson making a lot of movements in the Toyota, and appearing "very nervous" and "fidgety." Though Gipson denied having any form of identification on his person, Officer Hudson could visually tell that Gipson had something in his pockets. According to Officer Hudson, prior to Gipson's pat-down, he observed some "abnormalities in [Gipson's] pocket, and also within his waistband." Lastly, some of the other occupants in the Toyota with Gipson had already recanted their initial claim that they had not witnessed a robbery, forming a cloud of suspicion over all of the Toyota's occupants. In light of all these facts,

---

[18] *Terry*, 392 U.S. at 21-22; *Griffin v. State*, 215 S.W.3d 403, 409 (Tex. Crim. App. 2006).

we find that Officer Hudson could justifiably believe that his safety or that of others was in danger.

When Officer Hudson performed the pat-down on Gipson, he felt objects in Gipson's pockets that were the size of credit cards. Officer Hudson removed these objects so he could verify that none of the objects was a knife. We do not believe it was unreasonable for Officer Hudson to entertain such a possibility.[19]

## V. Conclusion

We conclude that Officer Foster's initial action of blocking the Toyota with his vehicle was a lawful stop of potential witnesses as described in *Lidster*. We further conclude that Officer Hudson's search of Gipson's person was the product of Officer Hudson's reasonable concern for his safety or the safety of others. Accordingly, we overrule Gipson's two issues on appeal and affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Publish. TEX. R. APP. P. 47.2(b).

Opinion delivered and filed this
the 28th day of August, 2008.

---

[19] *See Johnston v. State*, 643 S.W.2d 427, 430 (Tex. App.–Houston [14th Dist.] 1982, writ ref'd) ("The officer testified he had previously observed wallets to be so constructed as to hold a pistol or knife, and we hold that based upon this record, it was not unreasonable for the officer to remove it, open it to see if it was so constructed, and then hand it to appellant.").

8