

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00370-CR

———————————————

BIRDIE JEAN JACKSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Court at Law No. 2
Wichita County, Texas
Trial Court No. 75,218-F

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

By information, the State charged Birdie Jean Jackson with the offense of discharge of a firearm in certain municipalities, a Class A misdemeanor. *See* Tex. Penal Code Ann. § 42.12. After the trial court denied Jackson's motion to suppress, Jackson pleaded guilty as part of a plea bargain. The trial court accepted the plea agreement, found Jackson guilty, and sentenced her to four days in jail and a fine of $1,500.

On appeal, Jackson asserts that the trial court erred in denying her motion to suppress: "The issue at trial on this case was whether [the officer], under the totality of the circumstances test, had sufficient articulable facts demonstrating that the investigatory stop and detention of Jackson and her vehicle was supported by reasonable suspicion."[1] We hold that both the facts and the law support the trial court's ruling, overrule Jackson's contentions, and affirm the trial court's judgment.

---

[1]Jackson's brief presents three issues related to the motion to suppress with each issue containing numerous subpoints. The issues and subpoints alone span five pages, so we will not repeat them here. For simplicity's sake, her first issue complains about the constitutionality of the traffic stop, her second issue complains about the trial court's findings of fact, and her third issue attacks the trial court's conclusions of law.

## II. BACKGROUND

After responding to a 911 call regarding gunshots and a white vehicle speeding away, a police officer saw Jackson's white vehicle near the scene and stopped her. Jackson promptly admitted that she was the person who had fired the gunshots.

At trial, Jackson filed a motion seeking to suppress all the evidence that the State procured as a result of the officer's traffic stop. She asserted that the police had stopped her vehicle "without having . . . any reasonable suspicion of criminal activity" or without having observed any traffic violations, that she was stopped based on an anonymous 911 call, and that the detaining police officer had not developed any kind of reasonable suspicion of criminal activity "past, present[,] or future of any kind . . . in relation to the vehicle in which [she] was traveling [before] asking [her] questions."

The hearing on Jackson's motion to suppress featured only one witness, Officer Allen J. Russell of the Wichita Falls Police Department. He testified that he responded to a 911 firearm-discharged call on April 10, 2018. Officer Russell stated that an anonymous 911 caller reported having heard three gunshots on Irene Lane and then having seen a newer white Suburban "speeding away from the gunshots."

Officer Russell stated that he thought that the caller made the 911 call five to six minutes after hearing the gunshots. He acknowledged not knowing when the 911 call was made in relation to when he was dispatched.

3

Because shooting calls take priority over all others, Officer Russell said that he and his partner responded immediately. Officer Russell maintained that he arrived quickly after being dispatched, but he did not know the precise time.

Regarding the scene, Officer Russell explained that Irene Lane had only three houses on it and that after the third house, Irene Lane ended in a cul-de-sac. On the other side of Irene Lane was a church, but Officer Russell thought that the church used Harding Street as its address.

The officers fairly quickly found three shell casings in the yard at 810 Irene Lane, which was "maybe" the second house on the street. Officer Russell and his partner knocked on the door at 810 Irene Lane, but no one answered, and nobody was outside either. Meanwhile, the officers spotted a neighbor outdoors at the corner house.

While documenting the shell casings, Officer Russell stated that "a newer white SUV pulled up to Irene, . . . stopped, saw us, and then pulled out and left quickly." Officer Russell thought the SUV had acted suspiciously. The SUV did not pull up to 810 Irene Lane but pulled up to the corner house, so Officer Russell asked the neighbor who was outside that house about the vehicle, but the neighbor denied knowing whose SUV they had just seen.

"We saw . . . the SUV pull in and pull out, and we decided to jump in and follow it because we thought it matched the description," explained Officer Russell.

He thought that the SUV was the vehicle described in the 911 call, and on that basis, Officer Russell asserted that he had reasonable suspicion to stop it.

The vehicle that Officer Russell stopped was not a Suburban (described in the 911 call) but was a white GMC Yukon. Officer Russell explained that once he got behind the vehicle, he could see that it was not a Suburban, but he added, "A Suburban and Yukon look very similar." Officer Russell acknowledged that there were "[p]robably a fair number" of white SUVs in that area of town.

When asked to justify the traffic stop, Officer Russell responded: "I believe that I had enough reasonable suspicion that somebody might be injured or something like that with a shell casing in the yard, so we stopped the vehicle because it matched the description[,] and [I] wanted to look and see if they knew what happened there." After Officer Russell stopped the SUV, he asked its driver—Jackson—what had happened at 810 Irene Lane, and she responded that she had used a handgun that she had just recently purchased to fire shots into the air to blow off some steam. From the time Officer Russell was dispatched to the time he stopped Jackson was about thirty-four minutes.

Officer Russell clarified that officers do not receive the actual 911 call but receive instead a pop-up on a computer screen with all the information from the caller. He explained that dispatch also reads some of the more important details to the officers over the radio.

5

After hearing the evidence, the trial court denied Jackson's motion to suppress. Jackson requested and the trial court signed findings of fact and conclusions of law.

## III. DISCUSSION

The law recognizes three distinct types of interactions between the police and citizens: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013). A police officer is as free as any other person to approach citizens to ask for information or cooperation. *Id.*

### A. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court

6

determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

7

## B. The Traffic Stop

Jackson contends that Officer Russell had insufficient information to reasonably suspect that her vehicle was linked to any criminal activity. She emphasizes that the anonymous tip did not articulate what connection, if any, the white vehicle had to the gunshots and that Officer Russell did not see her do anything illegal. She concludes that an essential component to the traffic stop—reasonable suspicion that her SUV had been or was engaged in criminal activity—was missing.

### 1. Officer Russell responded to an anonymous call.

Jackson argues that Officer Russell was relying on an anonymous tip that did not provide adequate details to ensure any reliability and, further, that Officer Russell had no independent observations ensuring reliability. *See Florida v. J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 1378 (2000); *see also Navarette v. California*, 572 U.S. 393, 404–14, 134 S. Ct. 1683, 1692–97 (2014) ("After today's opinion all of us on the road, and not just drug dealers, are at risk of having our freedom of movement curtailed on suspicion of drunkenness, based upon a phone tip, true or false, of a single instance of careless driving. I respectfully dissent.") (Scalia, J., dissenting). The State, in contrast, contends that the anonymous 911 call was sufficiently detailed and that Officer Russell's objective observations confirmed the 911 call's accuracy.

### a. Anonymous tips present reliability concerns.

Anonymous tips alone seldom reflect how informants acquired their knowledge or whether the informants are trustworthy. *Navarette*, 572 U.S. at 397,

8

134 S. Ct. at 1688. Ordinary citizens generally do not explain how they came about their information, and an anonymous tipster's veracity is largely unknown and unknowable. *Id.*, 134 S. Ct. at 1688. Yet under appropriate circumstances, an anonymous tip can show sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop. *Id.*, 134 S. Ct. at 1688.

For example, in one instance, the United States Supreme Court recounted how an anonymous tipster had told the police that a woman would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right taillight and that the woman would be transporting cocaine. *Id.* at 397–98, 134 S. Ct. at 1688 (citing *Alabama v. White*, 496 U.S. 325, 331, 110 S. Ct. 2412, 2416–17 (1990)). After the officers confirmed certain details, they stopped the station wagon as it neared the motel and found cocaine in it. *Id.* at 398, 134 S. Ct. at 1688 (citing *White*, 496 U.S. at 331, 110 S. Ct. at 2416–17). The United States Supreme Court held that the officers' ability to corroborate various details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity. *Id.* at 398, 134 S. Ct. at 1688 (citing *White*, 496 U.S. at 331, 110 S. Ct. at 2416–17).

In contrast, the United States Supreme Court held in another case that no reasonable suspicion arose from a bare-bones tip that a young male in a plaid shirt standing at a bus stop was carrying a gun. *Id.* at 398, 134 S. Ct. at 1688 (citing *J.L.*, 529 U.S. at 268, 120 S. Ct. at 1377). The tipster did not explain how he knew about the gun and did not suggest that he had any special familiarity with the young man.

9

*Id.* at 398, 134 S. Ct. at 1688 (citing *J.L.*, 529 U.S. at 271, 120 S. Ct. at 1379). As a result, the Court concluded that the police had no basis for believing the tipster's allegation of concealed criminal activity. *Id.* at 398, 134 S. Ct. at 1688 (citing *J.L.*, 529 U.S. at 272, 120 S. Ct. at 1379). Furthermore, the tip included no predictions of future behavior that the police could use to corroborate and assess the tipster's credibility. *Id.* at 398, 134 S. Ct. at 1688 (citing *J.L.*, 529 U.S. at 271, 120 S. Ct. at 1379). Thus, the Court concluded that the tip was insufficiently reliable to justify a stop and frisk. *Id.* at 398, 134 S. Ct. at 1688.

### b. The tip was sufficiently reliable.

In Jackson's case, the 911 caller was anonymous, but the 911 caller provided three details: (1) three gunshots, (2) on Irene Lane, and (3) a newer white Suburban "speeding away from the gunshots." Officer Russell went to Irene Lane, found three shell casings, and eventually encountered a white SUV that looked very similar to a Suburban. As Officer Russell testified, "A Suburban and Yukon look very similar." Based on this information, an officer could reasonably conclude that the 911 caller had correctly identified the location, the number of gunshots, and a vehicle associated with the gunshots.

### c. Officer Russell did not have to rely strictly on the tip.

In addition to the 911 call, Officer Russell had more information. Irene Lane was a dead-end street, so through traffic would not pull onto it. The street also had only three houses, so anyone pulling onto Irene Lane would likely have some

connection to one of the three houses. The neighbor who was outside told Officer Russell that the white SUV had no connection to the corner house, so that suggested the white SUV had a link with one of the two remaining houses, one of which had spent shell casings in its front yard. Further, the white SUV was leaving the scene, which might have been consistent with innocently and mistakenly pulling onto Irene Lane but also might have communicated an attempt to avoid the police. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) (stating that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S. Ct. 2574, 2582 (1975) (stating that a driver's behavior, such as erratic driving or obvious attempts to evade officers, may be relevant and can support a reasonable suspicion); *see also Hernandez v. State*, No. 13-17-00649-CR, 2019 WL 5608239, at *6 (Tex. App.—Corpus Christi Oct. 31, 2019, no pet.) (mem. op., not designated for publication) (same). Finally, although any number of white SUVs might have been in that part of the city, only this one was on Irene Lane; thus, Officer Russell's selection was not random.

**2. A traffic stop is a detention, and a detention requires reasonable suspicion of criminal activity.**

A detention, as distinguished from an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000); *Medellin v. State*,

11

Nos. 02-10-00002-CR, 02-10-00003-CR, 2011 WL 2119668, at *3 (Tex. App.—Fort Worth May 26, 2011, no pet.) (mem. op., not designated for publication). An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Medellin*, 2011 WL 2119668, at *3.

In what is known as a *Terry* stop or an investigative detention, officers may stop and briefly detain a person suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry*, 392 U.S. at 22, 88 S. Ct. at 1880; *Medellin*, 2011 WL 2119668, at *3. Investigative detentions are less intrusive than arrests. *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011).

Traffic stops are more analogous to investigative detentions than custodial arrests and are thus analyzed as *Terry* stops. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150 (1984); *Medellin*, 2011 WL 2119668, at *3; *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, pet. dism'd, untimely filed). A traffic stop is a detention and must, therefore, be reasonable under the United States Constitution. *Young v. State*, 420 S.W.3d 139, 142 (Tex. App.—Texarkana 2012, no pet); *Medellin*, 2011 WL 2119668, at *3. An officer may initiate a traffic stop if the officer has reasonable suspicion that a crime was or is about to be committed. *See Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014).

### 3. A traffic stop may be otherwise justified.

With traffic stops, caselaw recognizes a hybrid justification based on consensual encounters and investigative detentions. These detentions are not based on reasonable suspicion that the vehicle's occupants have been or will be involved in criminal activity but on (1) officers' prerogative to initiate consensual encounters and (2) the vehicle's occupants' status as possible witnesses to a crime.

When an officer detains a person to determine whether the person being detained was a witness to a crime, the detention becomes distinguishable from those involved in a *Terry* stop. *Gipson v. State*, 268 S.W.3d 185, 188 (Tex. App.—Corpus Christi 2008, no pet.). The distinction lies in the fact that a detention made for the purpose of questioning a potential witness is not being made based on an officer's suspicion that the detainee was involved or about to be involved in criminal activity; rather, the detention is being made for the purpose of questioning the detainee about a third person. *Id.*

The law ordinarily permits police to seek the public's voluntary cooperation when investigating a crime. *Illinois v. Lidster*, 540 U.S. 419, 425, 124 S. Ct. 885, 889–90 (2004). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983).

Voluntary requests play a vital role in police investigatory work. *See Lidster*, 540 U.S. at 425, 124 S. Ct. at 890.

"The importance of soliciting the public's assistance is offset to some degree by the need to stop a motorist to obtain that help—a need less likely present where a pedestrian, not a motorist, is involved." *Id.*, 124 S. Ct. at 890. The difference is significant because an involuntary traffic stop amounts to a "seizure" in Fourth Amendment terms. *Id.* at 425–26, 124 S. Ct. at 890. In the absence of special circumstances, the Fourth Amendment forbids stops made without individualized suspicion. *Id.* at 423, 124 S. Ct. at 888–89 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 41, 121 S. Ct. 447, 454 (2000)). "[The Supreme Court has] never approved [an unparticularized-traffic-stop-]checkpoint program whose primary purpose was to detect evidence of ordinary [or random] criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." *Edmond*, 531 U.S. at 41, 121 S. Ct. at 454.

Yet when the purpose of a detention was to request the public's cooperation when investigating a crime, the Supreme Court said that the difference was not important enough to justify a rule like the one prohibiting all traffic stops absent reasonable suspicion that the vehicle itself was involved in criminal activity. *Lidster*, 540 U.S. at 426, 124 S. Ct. at 890. The Court added that stopping a motorist to seek public cooperation would likely be brief, that any accompanying delay should prove

14

no more onerous than many that typically accompany normal traffic congestion, and that the resulting voluntary questioning of a motorist was just as likely to prove important to the police as was the questioning of a pedestrian. *Id.*, 124 S. Ct. at 890. Given these considerations, the Supreme Court stated that it would seem anomalous were the law to ordinarily allow police freely to seek the voluntary cooperation of pedestrians but, conversely, to ordinarily forbid police to seek similar voluntary cooperation from motorists. *Id.*, 124 S. Ct. at 890.

Finally, the Supreme Court said that it was not concerned about an unreasonable proliferation of police traffic stops. *See id.*, 124 S. Ct. at 890. Rather, the Fourth Amendment's insistence that the stop be reasonable in context provided an important legal limitation. *See id.*, 124 S. Ct. at 890.

These considerations convinced the Court that a presumptive rule of unconstitutionality did not apply to traffic stops seeking public cooperation. *See id.*, 124 S. Ct. at 890. On the other hand, the absence of such a prohibitory rule did not mean that such traffic stops were automatically, or even presumptively, constitutional. *See id.*, 124 S. Ct. at 890. Rather, it meant that courts must judge the traffic stop's reasonableness (and thus its constitutionality) on the basis of the individual circumstances. *See id.*, 124 S. Ct. at 890. In judging reasonableness, we look to (1) the gravity of the public concerns served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. *See id.* at 427, 124 S. Ct. at 890; *Brown v. Texas*, 443 U.S. 47, 50–51,

15

99 S. Ct. 2637, 2640 (1979); *Gipson*, 268 S.W.3d at 188; *see also State v. Woldt*, 876 N.W.2d 891, 895–99 (Neb. 2016); *State v. Woldt*, 867 N.W.2d 637, 643–49 (Neb. Ct. App. 2015), *rev'd*, 876 N.W.2d 891 (Neb. 2016).

Although *Lidster* involved a checkpoint stop, *see* 540 U.S. at 422, 124 S. Ct. at 888, the Supreme Court of Nebraska concluded that *Lidster*'s principles applied beyond checkpoint cases. *Woldt*, 876 N.W.2d at 895–96. We have previously applied *Lidster* to a checkpoint stop. *See Hirmon v. State*, No. 02-05-00272-CR, 2006 WL 2854306, at *3–5 (Tex. App.—Fort Worth Oct. 5, 2006, no pet.) (mem. op., not designated for publication). And our sister court in *Gibson* applied *Lidster* in a non-checkpoint context. *See* 268 S.W.3d at 186–89.

### 4. The traffic stop was justifiable under *Lidster*.

#### a. Gravity of Public Concern

The gravity of public concern was high. Discharging a firearm in the city was itself a Class A misdemeanor. *See* Tex. Penal Code Ann. § 42.12. Discharging a firearm in a city can lead to tragedy. *See, e.g., Ramirez v. State*, No. 02-13-00540-CR, 2015 WL 4652771, at *1–3 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication). Someone might have been wounded or killed. Because there was more than one gunshot, more than one person might have been wounded or killed. Moreover, the motive behind the gunshots was still unknown, so law enforcement could not assume that the shootings would not continue. The gravity of public concern was great.

16

### b. Degree to Which Seizure Advanced Public Interest

Officer Russell had a 911 report of three gunshots and found three shell casings at 810 Irene Lane. Because no one answered at 810 Irene Lane, the white vehicle seen speeding away from the gunshots was the primary lead. While at the scene, a white vehicle generally meeting the description pulled onto Irene Lane. As mentioned before, because Irene Lane had only three houses and ended in a cul-de-sac, any vehicle pulling onto Irene Lane would likely have business with one of those three houses. Because the white vehicle promptly left, Officer Russell risked losing his best witness. Leaving the scene under these circumstances would have only heightened law enforcement's concerns. *See Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676; *Brignoni-Ponce*, 422 U.S. at 885, 95 S. Ct. at 2582; *see also Hernandez*, 2019 WL 5608239, at *6. The detention greatly served the public interest.

### c. Severity of Interference with Individual Liberty

If the driver of the white vehicle had no knowledge pertaining to the gunshots, and if the driver had simply pulled onto Irene Lane by mistake, then Officer Russell would have had no basis for detaining the driver further. The severity of the interference with the driver's individual liberty was minimal. Officer Russell's traffic stop might not have borne any fruit, but that did not mean that the detention was unreasonable under the circumstances.

### d. Conclusion

We hold that the traffic stop was justifiable as a detention under *Lidster*. *See Gibson*, 268 S.W.3d at 190.

## C. The Trial Court's Findings and Conclusions.

Jackson attacks the trial court's findings of facts and conclusions of law. Jackson complains—and we agree—that the trial court's factual findings do not track exactly Officer Russell's testimony.

For example, the first finding states that Officer Russell was dispatched to 810 Irene Lane. The prosecutor asked Officer Russell if he had responded to a call at 810 Irene Lane, and Officer Russell responded that he had. Later, however, Officer Russell clarified that he was sent to Irene Lane and Harding Street for gunshots on Irene Lane and that he had located the shell casings at 810 Irene Lane. Consequently, Officer Russell's testimony shows that he was not dispatched specifically to 810 Irene Lane, but he was dispatched regarding gunshots on Irene Lane, and 810 Irene Lane quickly became his focus once he had found the shell casings there.

Another example is the third finding, which states that Officer Russell arrived about five minutes after being dispatched. But Officer Russell did not testify that he had arrived about five minutes after being dispatched; rather, he testified that after getting the dispatch, he and his partner had arrived quickly at the location. He elaborated that shooting calls have priority, that they had responded immediately, and that they had headed to the location urgently without making any other stops. The

18

five minutes appears to have been conflated with Officer Russell's estimation of how much time elapsed between the shooting and the 911 call.

Our last example is the seventh finding in which the trial court found that Officer Russell saw a white SUV that was similar in size and color to the vehicle described in the 911 call. Officer Russell stated that he had seen a white SUV and acknowledged that an SUV and a Suburban were not exactly alike. Despite that, he thought it was the same vehicle reported in the 911 call. He explained, "A Suburban and Yukon [SUV] look very similar." Although Officer Russell mentioned the color, he said nothing about the relative size of the vehicles, unless that could be inferred by the similarities between Suburbans and Yukons.

These, then, are the type of discrepancies that Jackson attacks in her brief. We could add to our list, but these examples exemplify the nature of Jackson's complaints.

Our focus is on whether the trial court had evidentiary support for concluding that Officer Russell had a reasonable basis to detain Jackson. The trial court found that

- Officer Russell responded to a 911 call and was dispatched to Irene Lane regarding gunshots and a white Suburban seen leaving;

- once at the location, Officer Russell found shell casings at 810 Irene Lane;

- Officer Russell saw a white SUV similar to the vehicle described in the 911 call;

19

- the white SUV turned onto Irene Lane, turned around, and left;

- the person standing in the neighbor's yard told Officer Russell that he did not recognize the vehicle; and

- Officer Russell conducted a traffic stop on the white SUV.

The record supports those portions of the trial court's findings, and for our purposes, they sufficiently support the trial court's conclusion that the traffic stop was reasonable and, thus, constitutionally valid. We conclude that the unsupported portions of the trial court's findings are not essential to or dispositive of the trial court's ruling. *See High v. State*, No. 05-15-00074-CR, 2016 WL 4123661, at *6 (Tex. App.—Dallas July 29, 2016, no pet.) (mem. op., not designated for publication); *Rhodes v. State*, No. 02-13-00550-CR, 2015 WL 505104, at *4 (Tex. App.—Fort Worth Feb. 5, 2015, no pet.) (mem. op., not designated for publication).

Turning to the trial court's conclusions of law, they focus on whether Officer Russell had reasonable suspicion that Jackson had been or was about to be engaged in criminal activity. We have not directly answered that question. Rather, we have held that Officer Russell had a reasonable basis to effect a traffic stop to determine whether the vehicle's occupant was a possible witness to criminal activity and was willing to help Officer Russell with his investigation.

We uphold the trial court's ruling if both the record and any applicable legal theory support it. *Stevens*, 235 S.W.3d at 740; *Armendariz*, 123 S.W.3d at 404. Because

20

the trial court's ruling is supported by the record and is correct under an applicable legal theory, we do not disturb it.

## IV. CONCLUSION

We overrule Jackson's issues and affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 22, 2021