

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00486-CR
No. 02-19-00487-CR

_____

STEVEN CLAY SEYMORE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Wise County, Texas
Trial Court Nos. CR21073, CR21074

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Steven Clay Seymore appeals his state-jail-felony and second-degree-felony convictions for two instances of possession of methamphetamine. He argues that both convictions stem from a single *Terry* frisk,[1] that the frisk was an unconstitutional search, and that the trial court therefore abused its discretion by denying his motion to suppress. Because we hold that the *Terry* frisk was within the confines of the United States Constitution, we overrule Seymore's sole point,[2] and—after correcting a clerical error in one of the judgments sua sponte—we affirm the trial court's state-jail-felony judgment and affirm as modified its second-degree-felony judgment. *See* Tex. R. App. P. 43.2(a), (b).

## I. BACKGROUND[3]

The *Terry* frisk at the center of this appeal was conducted by Lieutenant Chad Lanier in May 2018. Seymore and Lieutenant Lanier had known one another for more than a decade before the frisk.

---

[1]*See Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968); *infra* Section II.A.2.

[2]Seymore raises his challenge to the *Terry* frisk as two points, but both points turn on the constitutionality of the same May 2018 frisk, and Seymore argues the points together. We therefore construe Seymore's two points as one.

[3]In our recitation of the relevant background facts, we include evidence presented to the trial court in the suppression hearings as well as evidence subsequently presented when the parties relitigated the Fourth Amendment issue before the jury. *See Black v. State*, 362 S.W.3d 626, 635–36 (Tex. Crim. App. 2012); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996); *Hardesty v. State*, 667 S.W.2d 130, 133 n.6 (Tex. Crim. App. 1984); *see also infra* Section II.A.1 (setting forth the standard and scope of review).

**A. Seymore's History with Lieutenant Lanier**

Although the full context of Lieutenant Lanier's introduction to Seymore is unclear, the two initially met in 2005 or 2006 while Lieutenant Lanier was working as an undercover narcotics officer—a role that required the lieutenant to infiltrate drug-trafficking organizations and purport to sell illegal narcotics. Lieutenant Lanier testified that, in the years since then, he had continued to interact with Seymore periodically. The lieutenant also indicated that he had arrested Seymore on occasions prior to the May 2018 frisk. Although Lieutenant Lanier did not detail each of Seymore's prior arrests, the evidence offered at trial—specifically, the conversations shown on the lieutenant's body-camera footage from the day of the challenged frisk[4]—referenced Seymore's history of methamphetamine use and supported a reasonable inference that at least some of Seymore's prior arrests were drug-related.[5]

---

[4]The body-camera footage from the day of the frisk included numerous statements from the lieutenant referencing Seymore's history of methamphetamine use, such as

- "So you're back at it [i.e., methamphetamine] again, huh?"
- "[A]s long as you've known me, when you saw me look in your eyes you knew I knew you had something on you, didn't you?"
- "I knew you had dope on you awhile ago[.] I [have] been around you long [enough]."

[5]During the punishment phase of the trial, the State offered evidence that Seymore committed numerous drug offenses during the same time period in which he met the lieutenant, including possessing chemicals with the intent to manufacture a controlled substance.

**B. May 2018 Encounters**

Given this history, Lieutenant Lanier recognized Seymore when the lieutenant saw him driving with a female passenger on a rural Crafton road in May 2018. The men had two encounters that day, with the second encounter culminating in the challenged *Terry* frisk.

**1. First Encounter**

During the first encounter, Lieutenant Lanier was driving near Crafton and saw Seymore's car on a private oil-field road. At the time, Lieutenant Lanier was searching for an injured man connected to an unrelated case, so when he recognized Seymore, he pulled alongside Seymore's vehicle and asked if Seymore or his female passenger had seen anyone matching the injured man's description. They had not.

But during their conversation, Lieutenant Lanier noticed "fresh needle marks" on Seymore's arm. The lieutenant also "knew [Seymore] didn't belong in the area," and he found Seymore's presence there suspicious. However, Seymore told the lieutenant that he and his female passenger were in a hurry as they were running late to pick up her children in Lake Worth. Given the lieutenant's ongoing search for the injured man, he told Seymore that "if [he was] up to no good, [he] need[ed] to get out of [t]here, go pick them kids up, and stay out of trouble."

## 2. Second Encounter and Frisk

But about an hour later, Seymore was back in the Crafton area and drove by Lieutenant Lanier again. This time, Seymore drove off the road and into a gravel-filled ditch,[6] so Lieutenant Lanier initiated a traffic stop.

Seymore immediately got out of his vehicle and walked back to Lieutenant Lanier's SUV, prompting the lieutenant to activate his body camera.[7] As Lieutenant Lanier explained why he had pulled Seymore over, the two men walked back to Seymore's vehicle and stood next to the driver's-side door, adding Seymore's passenger to the conversation through the open driver's-side window. Seymore explained that after his first interaction with the lieutenant that day, he had gone southeast to Chico to get gas. But when asked why he returned northwest to Crafton—rather than continuing southeast to Lake Worth[8]—he hesitantly responded

---

[6]Lieutenant Lanier testified that, as Seymore drove by, he saw through the window that Seymore "had the phone up in front of him."

[7]Lieutenant Lanier explained that his body camera continuously records video but does not record audio unless activated. Additionally, the continuous video recording is not saved to law enforcement's WatchGuard system by default; an officer must activate the body camera for that portion of the video to be saved to WatchGuard. Apart from WatchGuard, the continuous video stream can only be accessed through forensic dumping.

[8]Chico is located southeast of Crafton. Past Chico, Bridgeport is further southeast of Crafton, and Lake Worth is further still. *See* Tex. R. Evid. 201; *Black v. State*, 645 S.W.2d 789, 791 (Tex. Crim. App. 1983) ("As a general rule courts will take judicial notice of the location of a particular town or city . . . ."), *overruled on other grounds as recognized in Schmutz v. State*, 440 S.W.3d 29, 38 (Tex. Crim. App. 2014); *Barton*

5

that "we's just [pause] drivin' [pause] talkin'." As Seymore's female passenger expressed frustration that she had no idea where she was and needed to pick up her children, Seymore insisted that he was indeed heading southeast to Lake Worth but was doing so by a westerly route. But when Lieutenant Lanier questioned Seymore's alleged route to Lake Worth, Seymore's story shifted to a tale of confusion; he claimed he had not realized his intended route took him in the wrong direction, nor had he realized his route took him back through Crafton, and he laughed that he must have "got turned around."[9] Lieutenant Lanier became increasingly suspicious; he knew Seymore was raised in nearby Bridgeport, and he knew Seymore to be familiar with the roads and highways leading to Lake Worth. Plus, based on the lieutenant's history with Seymore, he knew Seymore to be acting "squirrelly" and "agitated" during their conversation.

Seymore then began to reach for the door of his vehicle. Lieutenant Lanier stepped toward Seymore and asked him if he "[had] anything on [him he] ain't supposed to have," directing Seymore to "put [his] hands on the car" for a frisk.

---

*v. State*, 948 S.W.2d 364, 365 (Tex. App.—Fort Worth 1997, no pet.) (per curiam) (recognizing that we may take judicial notice of geographical facts).

[9]Seymore's statements after the frisk shed light on the reason for his roundabout path and geographical confusion. Not long after the lieutenant found the methamphetamine, Seymore stated: "I should have known where I was at and I shouldn't have smoked that herb this morning cause it made me lose my sense of direction." And later in the encounter, Seymore admitted—in what appeared to be an unintentional slip—that he had planned to "stop and pick up some money" he was owed before heading to Lake Worth.

6

Lieutenant Lanier later testified that he had not known if Seymore was armed when he began the frisk. However, the lieutenant was aware of Seymore's criminal history, he believed Seymore "carrie[d] knives sometimes," and he was concerned by Seymore's "squirrelly" behavior. And although Seymore had not been violent with the Lieutenant during his prior arrests, the lieutenant testified that he "felt threatened" because "everything happens sometimes."

Seymore assumed the frisking posture as instructed. However, when he put his hands on the vehicle, Seymore leaned against the SUV such that the lieutenant could not reach the front of Seymore's waistband—a waistband obscured by a loose, untucked t-shirt. The lieutenant asked "what [Seymore was] leaning so far [forward into the vehicle] for" and directed him to "lean back a little bit."

Lieutenant Lanier then frisked Seymore's waistband and immediately felt a hard, non-bodily object in the front center of Seymore's pants. When the lieutenant asked Seymore what it was, Seymore insisted the object was his insulin kit but then changed his answer and stated that it was his "insulin kit and [he had] a little weed[;] that's it." Lieutenant Lanier retrieved a black case from Seymore's underwear and discovered not only marijuana but also 0.71 grams of crystal methamphetamine, four syringes, four plastic bags, and a digital scale. The lieutenant handcuffed Seymore and called for backup so another officer could watch Seymore and his passenger while the lieutenant searched Seymore's vehicle. Lieutenant Lanier explained to Seymore that

7

the need for backup was "mainly safety . . . since there's two of y'all and I'm not gonna pat her down."

Lieutenant Lanier's backup took approximately fifteen minutes to arrive. As they waited, Seymore repeatedly offered to "turn informant" and "give up other drug dealers, big drug dealers" in exchange for his freedom. After backup arrived and Lieutenant Lanier's vehicle search confirmed that "there was nothing else in [Seymore's] vehicle," the lieutenant agreed to Seymore's proposed deal, and Seymore was released.

## C. June 2018 Arrest

But Seymore's arrangement to help Lieutenant Lanier catch other drug dealers fell through. Consequently, the lieutenant obtained warrants for Seymore's arrest based on the methamphetamine and marijuana discovered during the May *Terry* frisk. Lieutenant Lanier then coordinated with another officer to locate Seymore and conduct a traffic stop to arrest him. At the time of his arrest, Seymore had 6.72 grams of methamphetamine in his underwear, along with plastic bags and a digital scale.

## D. Indictment, Trial, and Conviction

Seymore was indicted for two counts of possession of a controlled substance: (1) state-jail-felony possession of methamphetamine in an amount of less than one gram for the May incident, and (2) second-degree-felony possession of methamphetamine in an amount of four grams or more but less than two hundred

8

grams for the June incident. *See* Tex. Health & Safety Code Ann. § 481.115(b), (d). Seymore pled not guilty to both counts, and the parties tried Seymore's guilt to a jury.

At trial, Lieutenant Lanier testified regarding his encounters with Seymore and the evidence he discovered on Seymore's person. The State also offered, and the trial court admitted as evidence, Lieutenant Lanier's body-camera footage showing his second May 2018 encounter with Seymore. Seymore timely objected to "anything discovered as a result of [the May] traffic stop and detention," and he asked for a suppression hearing outside the presence of the jury "[u]nder the Fourth Amendment[ and] Article [I], Section 9 of the Texas Constitution."[10] After hearing brief testimony from Lieutenant Lanier outside the jury's presence,[11] the trial court overruled Seymore's objection, granted a running objection, and proceeded with the trial.

Later in the trial, when Lieutenant Lanier began to testify regarding the June arrest, Seymore objected and requested another suppression hearing because, he claimed, the narcotics discovered on Seymore in June were "fruit of the poisonous tree"—i.e., fruit of the "poisonous" May frisk.[12] As before, the trial court heard

---

[10]Seymore did not file a written motion to suppress.

[11]Lieutenant Lanier also testified that he did not have a warrant to frisk Seymore in May 2018.

[12]Seymore's objection to the June 2018 evidence came after the admission of Lieutenant Lanier's June body-camera footage depicting Seymore's June arrest and the methamphetamine discovered on his person during the arrest. However, Seymore's earlier, timely objection to "anything discovered as a result of [the May] traffic stop

9

testimony from Lieutenant Lanier outside the jury's presence and then overruled Seymore's objection and granted Seymore a running objection.

Undeterred, Seymore made a similar Fourth Amendment argument to the jury. Indeed, Seymore's Fourth Amendment challenge was a key component of his defense; he cross-examined Lieutenant Lanier regarding the reasonableness of the *Terry* frisk, and he used his closing argument to challenge the pat-down and to urge the jury to "uphol[d] the Fourth Amendment" by not considering evidence seized as a result of the allegedly illegal frisk.[13] The State addressed the suppression issue before the jury as well, arguing in its rebuttal that Lieutenant Lanier's pat-down was authorized by *Terry* and did not violate the Fourth Amendment.

The jury found Seymore guilty of both counts. The parties immediately proceeded to punishment, which was tried to the court. The State used two of Seymore's prior felony convictions—both for possession or transport of certain chemicals with the intent to manufacture a controlled substance—to enhance his punishments under the applicable habitual-offender statutes.[14] *See* Tex. Penal Code

---

and detention" arguably extended to the body-camera footage of the June arrest. *See infra* note 18.

[13]Seymore also emphasized the importance of the Fourth Amendment during voir dire.

[14]The reporter's record does not indicate how Seymore pled to the habitual-offender enhancement allegations. However, when the State offered documentary evidence of Seymore's prior offenses, Seymore stipulated to his identity. *Cf., e.g.*, *Allen v. State*, 671 S.W.2d 46, 47 (Tex. Crim. App. 1984) (defendant stipulated to identity but

Ann. §§ 12.42(d), 12.425(b). The trial court found all habitual-offender allegations to be true, and it sentenced Seymore to twenty years' confinement for the state-jail felony offense and forty years' confinement for the second-degree felony.

## II. DISCUSSION

In two points, which we construe as one, Seymore challenges the constitutionality of his *Terry* frisk.

## A. Constitutionality of Seymore's Frisk

Seymore contends that his May *Terry* frisk "was unsupported by specific and articulable facts to reasonably conclude that [he] might possess a weapon" and that the frisk was thus "unreasonable, illegal, and without any probable cause in violation of the Fourth and Fourteenth [A]mendments to the United States Constitution."[15] He

---

pled not true to enhancements); *Swanson v. State*, No. 01-05-01125-CR, 2006 WL 3438558, at \*6 (Tex. App.—Houston [1st Dist.] Nov. 30, 2006, pet. ref'd) (mem. op., not designated for publication) (distinguishing between defendant's stipulation as to identity and the State's burden to prove habitual-offender enhancements).

[15]Seymore also asserts that the frisk violated "Article I, Section 9 of the Texas Constitution, and Article[s] 1.06, 18.01, and 38.23 Tex. Code Crim[.] Proc." But Seymore did not separately brief these challenges; rather, he aggregated his challenges under the umbrella of the Fourth Amendment based on his conclusory assertion that the Texas Constitution and the Code of Criminal Procedure provide protections similar to or greater than those provided by the Fourth Amendment.

"[W]hen briefing constitutional questions, [parties] should carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground"; "briefs asserting rights under . . . the Texas Constitution [a]re inadequate if they d[o] not provide either argument or authority in support of that assertion." *Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991); *accord Muniz v. State*, 851 S.W.2d 238, 251–52 (Tex. Crim. App. 1993). Because

argues that the trial court abused its discretion by failing to suppress the "fruit of [this] illegal *Terry v. Ohio* frisk"—such "fruit" being the controlled-substance evidence seized from his person in May and June.[16] The State, in turn, responds that the frisk was constitutionally permissible because a reasonable person in Lieutenant Lanier's position could have reasonably believed that Seymore might be armed and that the officer's safety might be in danger.[17] We agree with the State.[18]

---

Seymore did not distinguish or separately brief his challenges under the Texas Constitution and Code of Criminal Procedure, we limit our review to his Fourth Amendment challenge. *See Heitman*, 815 S.W.2d at 690 n.23; *Saldivar v. State*, 209 S.W.3d 275, 280 n.8 (Tex. App.—Fort Worth 2006, no pet.) (mem. op.) (declining to address Article I, Section 9 challenge because appellant did not distinguish between his rights under the federal and state constitutions).

[16]Seymore appears to concede that Lieutenant Lanier's May 2018 traffic stop was a valid and constitutional detention. Similarly, although Seymore recites the constitutional limitations on the duration of traffic stops generally, he does not argue that Lieutenant Lanier's stop exceeded its constitutional duration.

[17]The State appears to concede that (1) the May *Terry* frisk uncovered the sole evidence of Seymore's state-jail-felony offense; (2) this May state-jail-felony offense was the sole cause of Seymore's arrest in June 2018; and (3) Seymore's June arrest produced the sole evidence of his second-degree-felony offense.

[18]Although the State does not dispute that Seymore preserved his objection to the *Terry* frisk, the record is ambiguous on the matter.

At trial, Seymore broadly objected to "anything discovered as a result of [the May] traffic stop and detention." During the suppression hearing, both parties questioned the lieutenant regarding not only his reasonable suspicion for the *Terry* frisk, but also his reasonable suspicion for the traffic stop, the length of the detention, and the scope of the frisk. Seymore did not clarify or narrow his objection to the traffic stop at any point during the hearing. The corresponding running objection was similarly ambiguous in scope.

## 1. Standard of Review

When reviewing a trial court's ruling on a motion to suppress evidence—including an oral motion lodged as an objection at trial—we apply a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hill v. State*, 303 S.W.3d 863, 870 (Tex. App.—Fort Worth 2009, pet. ref'd) (applying same standard to oral motion to suppress). We defer almost entirely to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.

---

It is thus unclear whether Seymore's objection to the May incident was sufficiently specific to make the trial court aware that he was challenging the constitutionality of the *Terry* frisk—as opposed to the constitutionality of the traffic stop, the length of the detention, or the scope of the frisk. *See* Tex. R. App. P. 33.1(a)(1). It is also unclear whether Seymore made the trial court aware that he intended for his running objection to the May incident to extend to the fruits of the resulting arrest warrant and June incident; otherwise, he did not timely raise his objection prior to the admission of body-camera footage depicting the contraband discovered during his June arrest.

Regardless, "although issues of error preservation are systemic in first-tier review courts such as ours, the Court of Criminal Appeals has explained that this means only that a court of appeals may not *reverse* a judgment of conviction without first addressing any issue of error preservation; the court of appeals may still affirm the judgment on another basis." *Redmond v. State*, No. 02-19-00381-CR, 2021 WL 1134410, at *6 n.11 (Tex. App.—Fort Worth Mar. 25, 2021, pet. filed) (cleaned up) (quoting *Meadoux v. State*, 325 S.W.3d 189, 193 n.5 (Tex. Crim. App. 2010)). Therefore, we address Seymore's suppression issue on its merits and affirm his convictions on that basis.

Crim. App. 2002). When, as here, there are no explicit fact findings, we view the evidence in the light most favorable to the trial court's ruling and imply the necessary fact findings as long as the record supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007).

Although our review of a motion to suppress is ordinarily limited to the evidence before the trial court at the time of its decision, since the parties consensually relitigated the suppression issue before the jury at trial, we consider the evidence presented to the fact finder in gauging the propriety of the trial court's ruling on the motion to suppress. *Black*, 362 S.W.3d at 635–36; *Rachal*, 917 S.W.2d at 809; *Hardesty*, 667 S.W.2d at 133 n.6; *Peddicord v. State*, 942 S.W.2d 100, 108 (Tex. App.—Amarillo 1997, no pet.); *see also Arnold v. State*, No. 10-13-00377-CR, 2015 WL 3820413, at *2 (Tex. App.—Waco June 18, 2015, no pet.) (mem. op., not designated for publication).[19] We must uphold the trial court's ruling if it is supported by the record and correct under any applicable legal theory. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018); *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016).

---

[19]Although unpublished opinions have no precedential value, Tex. R. App. P. 47.7(a), "we consider unpublished opinions with similar facts instructive and cite them in agreement with their guidance as to the application of settled law." *Cain v. State*, Nos. 02-19-00258-CR, 02-19-00259-CR, 2021 WL 1034862, at *4 n.8 (Tex. App.—Fort Worth Mar. 18, 2021, no pet. h.); *see also* Tex. R. App. P. 47.4.

**2. Fourth Amendment Law**

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amends. IV, XIV. A pat-down for weapons—known as a *Terry* frisk—constitutes a search within the meaning of the Fourth Amendment. *Terry*, 392 U.S. at 19, 88 S. Ct. at 1879. However, an officer is constitutionally justified in frisking an individual he has lawfully detained if a reasonably prudent person would be warranted in the belief that the individual was armed and that "[the officer's] safety or that of others was in danger." *Id.* at 27, 88 S. Ct. at 1883; *Lerma*, 543 S.W.3d at 191; *Furr*, 499 S.W.3d at 878; *O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000). The officer "need not be absolutely certain that the individual is armed"; he need only possess specific and articulable facts which, together with reasonable inferences from those facts, in light of the officer's experience, reasonably lead him to conclude that the detained individual might possess a weapon. *Terry*, 392 U.S. at 21–27, 88 S. Ct. at 1880–83; *Lerma*, 543 S.W.3d at 191; *Furr*, 499 S.W.3d at 878.

"Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual [subjective] state of mind at the time the challenged action was taken."[20] *O'Hara*, 27 S.W.3d at 551 (internal quotation

---

[20]Even if an officer testifies that he frisked the defendant for an impermissible reason, "the objective facts [may] nevertheless justify the pat-down" under the Fourth

15

marks omitted) (quoting *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2783 (1985)); *accord Lerma*, 543 S.W.3d at 191. To determine whether a reasonable officer could have believed that a detained individual might possess a weapon and the officer's safety might be in danger, courts have considered factors such as the officer's relative isolation during the encounter, whether the frisk occurred during a roadside stop, the detained individual's clothing, the detained individual's behavior, the detained individual's tendency to carry weapons, and the detained individual's criminal history.[21] *See Michigan v. Long*, 463 U.S. 1032, 1047–50, 103 S. Ct. 3469, 3480–81 (1983) (noting roadside context and rural location); *Lerma*, 543 S.W.3d at 192 (noting roadside context, isolation, and behavior); *Griffin v. State*, 215 S.W.3d 403, 409 (Tex.

Amendment; the officer's "subjective thought processes do not control." *Lerma*, 543 S.W.3d at 191–92 (upholding frisk even though the officer testified he conducted it as part of his routine); *O'Hara*, 27 S.W.3d at 553–55; *Carmouche v. State*, 10 S.W.3d 323, 329–30 (Tex. Crim. App. 2000) (upholding frisk even though the officer admitted that the frisk was at least partially motivated by his search for narcotics).

But the officer's state of mind is not entirely irrelevant; rather, the objective frisk analysis is "informed by the facts that were 'available' to the officer when he conducted the contested search." *State v. Garcia*, 569 S.W.3d 142, 150 (Tex. Crim. App. 2018); *accord Lippert v. State*, 664 S.W.2d 712, 721 n.11 (Tex. Crim. App. 1984).

[21]This is not an exhaustive list of all circumstances relevant to the frisk analysis; rather, we highlight the key circumstances that support the trial court's denial of the motion to suppress in this case. *Cf., e.g., Furr*, 499 S.W.3d at 880–81 (considering information from anonymous tip and "high drug, high crime" area in which frisk occurred, in addition to other factors); *McKellar v. State*, No. 07-06-00451-CR, 2007 WL 2262903, at *2 (Tex. App.—Amarillo Aug. 8, 2017, no pet.) (mem. op., not designated for publication) (considering time of night, in addition to other factors); *Rodriguez v. State*, No. 03-03-00140-CR, 2003 WL 22249714, at *5 (Tex. App.—Austin Oct. 2, 2003, no pet.) (mem. op., not designated for publication) (considering time of night and frequency of criminal conduct in the area, in addition to other factors).

Crim. App. 2006) (noting criminal history and nervous behavior); *O'Hara*, 27 S.W.3d at 553–55 (noting isolation and rural location); *Elliot v. State*, 548 S.W.3d 121, 127 (Tex. App.—Fort Worth 2018, pet. ref'd) (noting nervous behavior, bulges in clothing, and tendency to carry weapons); *Sheppard v. State*, No. 05-11-00852-CR, 2011 WL 6228341, at *2 (Tex. App.—Dallas Dec. 14, 2011, pet. ref'd) (not designated for publication) (noting loose clothing); *Rodriguez*, 2003 WL 22249714, at *5 (noting isolation and behavior, including inconsistent answers).

### 3. Application

An objectively reasonable officer in Lieutenant Lanier's position at the time of the May frisk could have reasonably believed that Seymore might possess a weapon and the officer's safety might be in danger because (1) the lieutenant was alone and outnumbered in a rural area; (2) the frisk occurred during a roadside encounter; (3) Seymore's clothing was sufficiently loose to conceal weapons in his pockets or waistband; (4) Seymore exhibited unusual, "agitated" behavior during the encounter, and he gave inconsistent stories; (5) the lieutenant knew Seymore to occasionally carry knives; and (6) Seymore had a criminal history that included violent and weapons-related offenses.

#### a. Officer Isolation

First, Lieutenant Lanier was relatively isolated during his encounter with Seymore; the lieutenant was alone and outnumbered in a rural area.

17

The Court of Criminal Appeals has recognized that an officer's solitude during a traffic stop may contribute to an objectively reasonable concern for the officer's safety. *O'Hara*, 27 S.W.3d at 553–55 (upholding frisk because, among other considerations, the officer was alone); *see also Rodriguez*, 2003 WL 22249714, at *5 (same). This concern increases still further if the officer is not only alone but outnumbered by the defendant and the defendant's companions as the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S. Ct. 882, 886 (1997); *see also Lerma*, 543 S.W.3d at 191 n.39 (quoting *Wilson*); *Green v. State*, No. 07-08-0284-CR, 2008 WL 5245902, at *2 (Tex. App.—Amarillo Dec. 17, 2008, pet. ref'd) (per curiam) (mem. op., not designated for publication) (upholding frisk because, among other things, "no other police officers were present[ and the officer] was outnumbered"); *Reno v. State*, No. 12-00-00330-CR, 2001 WL 1526806, at *7 (Tex. App.—Tyler Nov. 28, 2001, pet. ref'd) (not designated for publication) (upholding frisk because, among other things, "the officer was alone with two unknown persons"). Such was the case here; Lieutenant Lanier was not only alone when he stopped Seymore, but the lieutenant was outnumbered by Seymore and Seymore's female passenger. In fact, in the body-camera footage, the lieutenant expressly referenced the safety risk created by the fact that he was outnumbered; after the frisk, Lieutenant Lanier told Seymore that he needed to wait for backup for "safety" because "there's two of y'all."

Moreover, the lieutenant's isolation was all the more pronounced due to the rural setting in which the traffic stop occurred. Indeed, even after Lieutenant Lanier called for backup, it took more than fifteen minutes for another law enforcement officer to arrive at his location. Both the United States Supreme Court and the Texas Court of Criminal Appeals have recognized that rural surroundings may contribute to an officer's objectively reasonable concern for his safety. *Long*, 463 U.S. at 1050, 103 S. Ct. at 3481 (noting rural location as a factor supporting *Terry* frisk of vehicle); *O'Hara*, 27 S.W.3d at 553–55 (upholding frisk because, among other things, "it was the middle of the night in a rural area"). Lieutenant Lanier's rural surroundings no doubt compounded his isolation here, and the setting contributed to a reasonable concern for the lieutenant's safety.

### b. Roadside Encounter

Moreover, the roadside nature of Seymore's encounter with Lieutenant Lanier contributed to a reasonable concern for the lieutenant's safety.

Numerous courts—including the United States Supreme Court and Texas Court of Criminal Appeals—have acknowledged that "traffic stops are 'especially fraught with danger to police officers.'" *Lerma*, 543 S.W.3d at 191 (quoting *Long*, 463 U.S. at 1047, 103 S. Ct. at 3480); *see Carmouche*, 10 S.W.3d at 330 (quoting *Long* for the rule that "roadside encounters between police and suspects are especially hazardous"). "[T]he risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that

evidence of a more serious crime might be uncovered during the stop.'" *Arizona v. Johnson*, 555 U.S. 323, 331, 129 S. Ct. 781, 787 (2009) (quoting *Wilson*, 519 U.S. at 414, 117 S. Ct. at 886); *see Wilson*, 519 U.S. at 413–14, 117 S. Ct. at 885–86 (noting number of law enforcement officers assaulted or killed during traffic stops); *Long*, 463 U.S. at 1048 & n.13, 103 S. Ct. at 3480 & n.13 (recognizing that a significant percentage of police shootings occur during roadside encounters); *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App. 1997) ("The Supreme Court [has] noted the large number of assaults on police officers during traffic stops . . . .").

Here, Lieutenant Lanier observed "fresh needle marks" on Seymore's arm and suspected him of using a controlled substance—a more serious crime than the traffic offense for which Seymore was stopped. The lieutenant did not know if Seymore's "squirrelly" behavior was an attempt to hide other offenses, nor did he know if Seymore was sufficiently motivated to prevent the detection of other crimes by lashing out. The roadside nature of the encounter thus contributed to a reasonable concern that the lieutenant's safety might be in danger.

### c. Loose Clothing

Additionally, Seymore's baggy clothing contributed to an objectively reasonable concern that Seymore might be armed. Lieutenant Lanier testified and his body-camera footage confirmed that Seymore was wearing an untucked shirt, which was sufficiently loose to conceal Seymore's waistband and facilitate the hiding of weapons.

20

Indeed, as the frisk ultimately revealed, Seymore's clothing was sufficiently baggy to conceal a package of contraband hidden in his underwear.

Though wearing loose clothing in Texas during the month of May is far from suspicious standing alone, it may contribute to an officer's reasonable concern for his safety when combined with other factors. *See Sheppard*, 2011 WL 6228341, at *2 (upholding frisk because, among other things, "appellant was dressed in very loose clothing, including baggy pants and an over-sized tee shirt that obstructed his waistband"); *Hooper v. State*, No. 05-10-00120-CR, 2011 WL 3690009, at *3 (Tex. App.—Dallas Aug. 24, 2011, no pet.) (mem. op., not designated for publication) (upholding frisk because, among other things, the officer testified that the defendant "wore baggy pants and a jacket, clothing that made it very easy to hide a weapon"); *McKellar*, 2007 WL 2262903, at *2 (noting that "the nature of the clothes being worn (*i.e.* clothes that were sufficiently baggy to facilitate the hiding of weapons)" contributed to the officer's "reasonabl[e] infer[ence] that the detainees may be armed"); *cf. Furr*, 499 S.W.3d at 876, 879–81 (considering defendant's sweating a factor supporting reasonableness of the detention and frisk but noting that the court of appeals concluded sweating in a Texas summer was not suspicious). Here, Seymore's baggy clothing was one factor among many that contributed to a reasonable concern that Seymore might be carrying and concealing a weapon.

### d. Strange Behavior

Seymore's behavior—exiting his vehicle without prompting, acting agitated, and giving strange and inconsistent responses to Lieutenant Lanier's questions—also contributed to the lieutenant's objectively reasonable safety concerns.

When Lieutenant Lanier initiated the traffic stop, Seymore exited his vehicle without prompting, and he approached Lieutenant Lanier's SUV "before [the lieutenant] could even get out of the car." We have recognized that it is "out of the ordinary" for an individual to "ope[n] the doors and immediately exit[] the [vehicle]" when pulled over for a traffic stop. *Hill*, 303 S.W.3d at 872 (discussing testimony to that effect); *see also Harper v. State*, No. 02-17-00257-CR, 2018 WL 3154188, at *1 (Tex. App.—Fort Worth June 28, 2018, no pet.) (mem. op., not designated for publication) (noting defendant's "attempt[] to exit the vehicle without being asked to do so" as one aspect of defendant's suspicious behavior). Indeed, Lieutenant Lanier testified that when Seymore began to approach the lieutenant's vehicle, he "got out [to] ma[k]e sure that he wasn't going to come all the way to [the lieutenant's] car" and "to make sure that [Seymore] wasn't gonna run or . . . have a fight or anything." The lieutenant indicated that this behavior was also what prompted him to activate his body camera.

Moreover, after spontaneously exiting his vehicle, Seymore exhibited "squirrelly" and "agitated" behavior, and he gave suspicious explanations as to why he was in the Crafton area. *See Griffin*, 215 S.W.3d at 409 (upholding frisk based in part on appellant's nervous behavior); *Elliot*, 548 S.W.3d at 127 (upholding frisk based in

22

part on appellant's "agitated and nervous" behavior); *cf. Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013) (recognizing that "nervous or evasive behavior is a relevant factor in determining reasonable suspicion for a *Terry* stop and frisk," though cautioning that "it is not particularly probative" and "is not sufficient to establish reasonable suspicion" standing alone). Seymore's return to the Crafton area contradicted his initial story that he was in a hurry to get to Lake Worth, the route Seymore claimed to be traveling to Lake Worth was illogical, and his subsequent story that he had gotten "turned around" contradicted his longstanding knowledge of the area. *See Rodriguez*, 2003 WL 22249714, at *5 (upholding *Terry* frisk based in part on appellant's fidgety, strange behavior and conflicting answers). Seymore even indirectly acknowledged that his initial route and responses were out of the ordinary; after Seymore had been frisked and handcuffed, he bemoaned the fact that he "ha[d] smoked that herb this morning cause it made [him] lose [his] sense of direction."

Seymore's suspicious actions and strange responses thus contributed to an objectively reasonable concern that he might be armed and Lieutenant Lanier's safety might be in danger.

### e. Weapons History

Additionally, Lieutenant Lanier testified that, based on his experience with Seymore in the past, he believed Seymore "carrie[d] knives sometimes." When an individual or group has a reputation for carrying weapons, this reputation may contribute to an officer's belief that the individual might be armed and to the officer's

23

corresponding concern for his safety. *See Elliot*, 548 S.W.3d at 127 (upholding frisk based in part on officer's experiential knowledge that individuals in the area often carried weapons); *see also Parker v. State*, No. 03-04-00133-CR, 2005 WL 1842742, at *4 (Tex. App.—Austin Aug. 4, 2005, pet. struck) (mem. op., not designated for publication) (upholding frisk based in part on officer testimony that the defendant "was known to carry knives and razor blades").

### f. Criminal History[22]

---

[22]The State argues that Seymore's "history of narcotics involvement" and "[s]uspicion of involvement in the dealing of drugs" supported his frisk.

We agree with the State that, in general, "it is objectively reasonable for a police officer to believe that persons involved in the drug business are armed and dangerous." *Griffin*, 215 S.W.3d at 409; *accord Furr*, 499 S.W.3d at 881; *Carmouche*, 10 S.W.3d at 330 (explaining that "weapons and violence are frequently associated with drug transactions"). But Seymore's prior convictions evidencing his involvement in the drug business—his convictions for attempting to manufacture narcotics and for possessing or transporting chemicals with the intent to manufacture narcotics—were not introduced during the guilt–innocence phase. And although Lieutenant Lanier testified that he found plastic bags and a digital scale on Seymore's person, and although the May body-camera footage showed Seymore discussing his drug sales after the frisk, the State did not introduce guilt–innocence evidence to show that, *before the frisk*, Lieutenant Lanier suspected Seymore of trafficking narcotics or that the lieutenant knew Seymore to be a drug dealer. *See Lippert*, 664 S.W.2d at 721 n.11 ("[T]he information to be considered is that available to the officer at the time of the stop and frisk.").

Instead, the State's guilt–innocence evidence demonstrated that, before the frisk, Lieutenant Lanier suspected Seymore of *using* narcotics due to the "fresh needle marks" on Seymore's arm. Similarly, the May body-camera footage included references to Seymore's history of drug use, but not to his history of drug dealing. The Court of Criminal Appeals has held that the "guns-follow-drugs" presumption does not extend to individuals suspected of "mere drug use." *Furr*, 499 S.W.3d at

24

Finally, in addition to the factors already discussed, a reasonable officer in Lieutenant Lanier's position could have believed Seymore might be armed due to Seymore's criminal history; specifically, his history of committing violent and weapons-related offenses.

Although a defendant's criminal history alone is not generally sufficient to justify a *Terry* frisk, it may contribute to an officer's reasonable concern for his safety in combination with other factors.[23] *Griffin*, 215 S.W.3d at 409 (upholding *Terry* frisk based in part on police knowledge of the defendant's criminal history); *cf. Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S. Ct. 338, 343 (1979) (holding frisk unconstitutional because, among other things, the officer did not "recognize[] [the defendant] as a person with a criminal history"); *Lippert*, 664 S.W.2d at 721 (holding frisk unconstitutional because, among other things, "[t]here [wa]s no showing that Officer Blake or other officers knew of any prior criminal record of the appellant, including drug arrests or convictions").

Here, Lieutenant Lanier testified that he was familiar with Seymore's criminal history and that it factored into his concern for his safety and his belief that Seymore

---

880–81. Therefore, we do not rely on Seymore's drug-related history to support the frisk in this case.

[23]Many of the federal circuit courts have held similarly. *See, e.g.*, *United States v. Bishop*, 940 F.3d 1242, 1249 n.4 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 1274 (2020); *United States v. Esquivel*, 575 F. App'x 270, 272 (5th Cir. 2014) (per curiam); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007); *United States v. Majors*, 328 F.3d 791, 795 (5th Cir. 2003) (per curiam).

might be armed. The lieutenant specifically testified that he knew Seymore's criminal history included charges for unlawfully carrying a weapon and assault.[24] Viewed objectively, an officer in Lieutenant Lanier's position with knowledge of Seymore's criminal record—combined with the other factors previously discussed—could have possessed a reasonable belief that Seymore might be armed and a corresponding concern for the officer's safety. *See Soto v. State*, No. 10-15-00029-CR, 2015 WL 4858338, at *2 (Tex. App.—Waco Aug. 13, 2015, pet. ref'd) (mem. op., not designated for publication) (upholding frisk based on passenger's criminal history, among other things); *Michel v. State*, No. 08-03-00080-CR, 2004 WL 1078497, at *5 (Tex. App.—El Paso May 13, 2004, no pet.) (not designated for publication) (holding protective sweep of home was reasonable "due to Appellant's history with weapons[ and] his violent tendencies," among other considerations).

### 4. Inapplicable Case Law

As the above discussion demonstrates, multiple objective factors support the trial court's conclusion that a reasonable officer in Lieutenant Lanier's position could have reasonably believed Seymore was armed and the officer's safety was in danger. Yet, Seymore argues that four nonbinding cases from our sister courts—*Guevara*, *Thomas*, *Johnson*, and *Parks*—are "on all [f]ours" with this appeal, and he urges us to

---

[24]During the punishment phase, the State also presented evidence that Seymore had been convicted of evading arrest.

follow these cases and hold that the May frisk was unreasonable. All four cases are distinguishable.

In *Guevara*, the First District Court of Appeals held that a *Terry* frisk was unconstitutional. 6 S.W.3d 759, 764–65 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). However, Guevara's frisk occurred in the commercial parking lot of a Shipley's Do-Nuts shop, and the two officers involved in the surveillance and detention outnumbered the defendant. *Id.* at 761–62. The officers surveilled and approached Guevara based on an anonymous tip, but there was no indication that the officers knew Guevara's criminal history. *Id.* at 764. In contrast, Seymore was frisked during a roadside encounter in an isolated rural area. Lieutenant Lanier was alone and outnumbered during the encounter, and the lieutenant was aware of Seymore's criminal history. *Guevara* is not on point.

In Seymore's next case, *State v. Thomas*, the San Antonio Court of Appeals addressed the defendant's frisk in the dicta of an unpublished opinion. No. 04-14-00756-CR, 2016 WL 1359412, at *5–6 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (mem. op., not designated for publication); *see* Tex. R. App. P. 47.7(a). The *Thomas* court was reviewing an order granting a motion to suppress—a procedural posture that required the reviewing court to make all inferences in favor of suppression. *Thomas*, 2016 WL 1359412, at *4. Here, we are reviewing a trial court's denial of a motion to suppress, and therefore make the opposite inferences. *See Garcia-Cantu*, 253 S.W.3d at 241; *Wiede*, 214 S.W.3d at 24–25. Furthermore, in *Thomas*, the

27

defendant had only been involved in two prior police incidents and was believed to be the victim in both. *Thomas*, 2016 WL 1359412, at *6. Here, Seymore had numerous prior arrests and convictions. *Thomas* thus not only lacks precedential value but bears little resemblance to the current appeal. *See* Tex. R. App. P. 47.7(a).

The last two cases Seymore relies upon—*Johnson* and *Parks*—bear even less resemblance to Seymore's appeal. *See Johnson v. State*, 469 S.W.3d 708, 715–16 (Tex. App.—San Antonio 2015, no pet.); *Parks v. State*, 330 S.W.3d 675, 681–83 (Tex. App.—San Antonio 2010, pet. ref'd). Both cases turned on challenges to the defendants' detentions, rather than challenges to their *Terry* frisks. *Johnson*, 469 S.W.3d at 715–16 (holding Johnson was illegally detained and that his consent to the frisk was not an independent act of free will); *Parks*, 330 S.W.3d at 677, 681–83 (holding officer lacked reasonable suspicion of criminal activity to justify detention). Seymore does not dispute Lieutenant Lanier's reasonable suspicion to detain him, so we fail to see how *Johnson* and *Parks* are "on all [f]ours" with this case.

We therefore decline Seymore's invitation to follow *Guevara*, *Thomas*, *Johnson*, or *Parks*; these cases are inapplicable.

**5. Conclusion**

When the challenged *Terry* frisk occurred in May 2018, Lieutenant Lanier was conducting a roadside traffic stop by himself, he was in a rural area, he was outnumbered by Seymore and Seymore's passenger, he could not tell if Seymore was hiding any weapons under his loose shirt, he observed Seymore exhibiting odd

28

behavior and giving inconsistent stories, he knew from experience that Seymore occasionally carried knives, and he knew Seymore had a criminal history that included assault and unauthorized possession of a weapon, among other offenses. Considering these circumstances, a reasonable officer in Lieutenant Lanier's position could have reasonably suspected that Seymore might be armed and could have reasonably believed that the officer's safety might be in danger. *See Terry*, 392 U.S. at 21–22, 27, 88 S. Ct. at 1880, 1883. The trial court did not abuse its discretion by finding as much and denying Seymore's motion to suppress the evidence discovered as a result of his May frisk. We overrule Seymore's sole point.

## B. Clerical Error

We raise a second point sua sponte: our review of the record revealed a clerical error in one of Seymore's judgments of conviction.[25] Specifically, Seymore's second-degree-felony judgment recites that the trial court found the allegations in the second of his two habitual-offender enhancements to be not true.[26] The record, however, reveals that the trial court found all habitual-offender enhancements to be true.

---

[25]Our authority to correct a clerical error in a judgment "depends neither on a party's request nor on whether a party objected in the trial court." *Cain*, 2021 WL 1034862, at *9 (quoting *Ette v. State*, 551 S.W.3d 783, 792 (Tex. App.—Fort Worth 2017), *aff'd*, 559 S.W.3d 511 (Tex. Crim. App. 2018)).

[26]Seymore's second-degree-felony judgment of conviction was entered in trial court cause number CR21073 and is currently on appeal with this court in cause number 02-19-00486-CR.

"When there is a conflict between the oral pronouncement of sentence in open court and the sentence set out in the written judgment, the oral pronouncement controls." *Thompson v. State*, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003). Thus, the trial court's oral pronouncement that it found enhancement paragraph two to be true controls over the conflicting entry in the written judgment; the entry in the judgment is erroneous. But this error is one of form; it is a clerical error in the documentation of the oral pronouncement rather than a substantive error in judicial reasoning. *See Collins v. State*, 240 S.W.3d 925, 928 (Tex. Crim. App. 2007) (describing a clerical error as an "error[] that w[as] not the result of judicial reasoning"); *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988) (describing a clerical error as "one which does not result from judicial reasoning or determination"); *Cain*, 2021 WL 1034862, at *9 (quoting *Poe*). The error thus could have been corrected by the trial court's entry of a judgment nunc pro tunc. *See Collins*, 240 S.W.3d at 928 ("A judgment nunc pro tunc is the appropriate avenue to make a correction when the court's records do not mirror the judgment that was actually rendered.").

Because "[a]ppellate courts have the power to modify whatever the trial court could have corrected by a judgment nunc pro tunc when the information necessary to correct the judgment appears in the record," we modify Seymore's second-degree-felony judgment to reflect the trial court's oral pronouncement finding enhancement paragraph two to be true. *See Cain*, 2021 WL 1034862, at *9 (quoting *Ette*, 551 S.W.3d at 792); *see also* Tex. R. App. P. 43.2(b); *Wiley v. State*, Nos. 01-05-00033-CR, 01-05-

00034-CR, 2006 WL 1428850, at *3 (Tex. App.—Houston [1st Dist.] May 25, 2006, no pet.) (mem. op., not designated for publication) (modifying judgment sua sponte to reflect that trial court found enhancement paragraphs true).

### III. CONCLUSION

Having overruled Seymore's sole point, we affirm his state-jail-felony judgment of conviction (cause number 02-19-00487-CR), and we affirm as modified his second-degree-felony judgment of conviction (cause number 02-19-00486-CR).

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 3, 2021